**Charles KUCHEL, Appellant,**

**v.**

**STATE of Indiana, Appellee.**

**No. 50S00–8808–CR–765.**

Supreme Court of Indiana.

April 30, 1991.

James N. Clevenger, Kizer, Neu, Joyce, Wyland, Humphrey, Wagner & Gifford, Plymouth, for appellant.

Linley E. Pearson, Atty. Gen., Amy Schaeffer Good, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

Appellant initially was charged in a forty-five count information with multiple offenses stemming from a series of sex-related attacks perpetrated upon three different women during the summer of 1983. A jury trial resulted in his conviction of twenty of the counts alleged; that judgment was reversed by this Court on direct appeal. *Kuchel v. State* (1986), Ind., 501 N.E.2d 1045.

In 1988 appellant was retried to a jury on those twenty counts and was convicted of seventeen counts as follows: two counts of Criminal Deviate Conduct, a Class A felony; five counts of Battery, a Class C felony; one count of Criminal Recklessness, a Class C felony; two counts of Intimidation, a Class C felony; one count of Criminal Confinement, a Class D felony; two counts of Intimidation, a Class A misdemeanor; one count of Causing an Offense, a Class A misdemeanor; and three counts of Battery, a Class B misdemeanor. He was sentenced to the presumptive term for each felony count and to one-half the maximum term for each misdemeanor count. The first criminal deviate conduct count was enhanced by thirty (30) years by reason of a finding of habitual offender status, and all terms were ordered served consecutively for a total sentence of one hundred thirty-four (134) years and ninety (90) days. This is a belated direct appeal from that judgment.

The facts are: In the spring of 1983, appellant met P.K. at the truck-stop restaurant where she worked near Plymouth, Indiana. On or about their third date, after P.K. refused his request to be fellated, appellant, who was armed with a Bowie knife, removed her coat, grabbed her by the hair forcing her head down between his legs, and compelled her to perform fellatio. He later drove her home and threatened she would "pay dearly" if she ever told

anyone of the incident. On other occasions while in the presence of other men, appellant lifted or cut open P.K.'s shirt thereby exposing her breasts, bragging that he was an "outlaw" and could do whatever he wanted, whenever he wanted, and threatened harm to P.K.'s family and sons if she ever caused him trouble.

One night in June of 1983, P.K. left a tavern in Plymouth and found appellant and his friend, Jerry Cook, sitting in her car. Appellant grabbed P.K., said she was his "old lady," and ordered her to fellate him. When she begged not to, he banged her head against the car window and forced her to do it while his friend laughed. While leaving, appellant told P.K. that if she reported him to the authorities, he would slit the throats of her parents and children and perform anal sex on her mother.

One evening in August of 1983, P.K. and appellant were in a tavern and when he started making a scene about being an outlaw, P.K. left on foot. Appellant pursued her, forced her into his car and drove out into the country. There, in Cook's presence, appellant slit open P.K.'s top and forced her to undress in the car headlights. He dropped his knife on her foot, nearly severing her toe, and made her turn around in circles. He then threw her in the car and drove back to Plymouth, where she jumped from the moving car and escaped, appellant trying to run her down in the process.

In June of 1983, appellant met P.M., a co-worker of P.K., at a tavern and they all went to a truck stop for breakfast. After P.K. and P.M. argued, P.M. left with appellant. They drove out to a lake, where appellant showed her his knife, threatened to rape or kill her and grabbed P.M.'s breasts and her genital area and indicated she was not free to leave. He eventually took her back to the truck stop, twice pinching her breasts very hard before letting her out.

Appellant met R.F. in the early summer of 1983. At a tavern in Plymouth, he pulled up her shirt against her will and exposed her breasts to the bartender and later that evening repeated this act outside the tavern in front of a deputy sheriff. Appellant told R.F. that evening that she was going to be his "old lady" forever. On another occasion, as appellant was driving R.F. to Warsaw, Indiana, he pulled off the road and, grabbing R.F. by the hair, forced her to fellate him. Another time, appellant refused to allow R.F. to leave a party on her own and, saying he would have to "tame" her, struck her very hard on the head.

On a later occasion, appellant and two friends picked up R.F. as she was walking and drove out on Birch Road in Marshall County. Appellant wanted her to have sex with all three of them; she dissuaded him from that, but appellant, wearing his Bowie knife and threatening to use it, forced her to submit to sexual intercourse on the hood of the car and then performed cunnilingus on her while his friends watched. On yet another occasion, R.F. testified, appellant forced her to stay with him at a friend's house for three days, taking away her car keys and forcing her to have sexual intercourse against her will. When she finally convinced him to let her leave, he told her to return by a certain time or he would kill her. At home, R.F. began crying and told her mother about appellant's treatment of her; they subsequently contacted the Warsaw Police Department. The investigation ensuing from R.F.'s complaint as well as from subsequent allegations made by a fourth woman, M.Y., culminated in the instant charges.

Appellant contends the trial court erred in denying his motion to dismiss Counts 1, 2, 3, 6, 7, 11, 12, and 13 for lack of evidence of proper venue in Marshall County. Counts 1, 2, and 3 were charges of criminal deviate conduct, battery and intimidation stemming from the incident where appellant grabbed P.K. by the hair, forced her to perform fellatio and threatened she would "pay dearly" if she told anyone. Counts 6 and 7 were criminal recklessness and battery charges arising out of the incident where appellant cut P.K.'s toe with his knife. Counts 11, 12, and 13 were two counts of battery and one of criminal con-

finement arising from the incident where appellant told P.M. she was not free to leave his truck and then grabbed her breasts and her genital area.

■ In Indiana, a criminal defendant has the right to be tried in the county where the crime was committed. *Ind. Const.* art. I, § 13; Ind.Code § 35–32–2–1; *Sears v. State* (1983), Ind., 456 N.E.2d 390. Appellant argues the evidence as to Counts 1, 2, and 3 shows these offenses occurred at the same location as those pertaining to Counts 6 and 7, which undisputedly occurred in Starke County. However, regarding his citation to the record in support wherein P.K. testified the toe-cutting incident occurred when appellant took her "right back to the property he had taken me to before," it is unclear that the prior occasion P.K. is referring to involved the offenses charged in Counts 1, 2, and 3. Conversely, evidence that those counts were perpetrated at a country lot where appellant had formerly resided and that this lot is located in Marshall County is clear and sufficient to support by a preponderance the trial court's findings that Counts 1, 2, and 3 had proper venue in Marshall County. *See Boze v. State* (1987), Ind., 514 N.E.2d 275.

■ The offenses charged as Counts 6 and 7 occurred in a field approximately one and one-half miles west of the Starke–Marshall county line in Starke County. Citing *Stone v. State* (1988), Ind., 531 N.E.2d 191 and *Kuchel, supra* for the proposition that where a crime commences in one county and is continued into adjoining counties the charges may be brought in any of the involved counties, the State argues that because appellant, after making an abusive telephone call to the victim, picked her up at her parents' home in Marshall County and then drove her to a tavern in Starke County where their altercation commenced, Counts 6 and 7 were part of a continuous chain of events beginning in Marshall County and continuing into Starke County such that venue would be proper in either county.

This is borne out by P.K.'s testimony that she went with appellant because of his threats to her and her family. The jury was justified in finding that this was a continuing abuse of P.K. which was begun in Marshall County.

Appellant cites *Sears, supra;* there, however, we held venue for the deviate conduct charge was not proper in the forum county, where the defendant picked up the victim, because the evidence showed that the victim went of his own free will and that the crimes perpetrated upon him occurred entirely within the adjoining county. Thus, *Sears* is inapplicable to the case at bar.

■ Counts 11, 12, and 13 were charges of battery and confinement arising from the incident where P.M. left a truck stop located in Starke County with appellant, who then drove to a lake and, after informing P.M. she was not free to leave his truck, grabbed her breasts and her genital area. Appellant testified, and now maintains, that the lake was Eagle Lake located in Starke County. However, P.M. and a deputy sheriff testified the lake described by P.M. was Flat Lake located in Marshall County. The trial court had before it sufficient evidence to find proper venue in Marshall County. *See Boze, supra.* The evidence supports the trial court's finding that venue for all charges properly lay in Marshall County.

Appellant contends the trial court erred in denying his motion for a directed verdict of acquittal as to Counts 1, 11, 12, 18, and 19 due to an insufficiency of evidence as to involvement of a deadly weapon such as to elevate the counts to a more severe felony classification. As per Ind.Code § 35–42–4–2, Count 1 charged criminal deviate conduct as a Class A felony for having been committed upon P.K. while appellant was armed with a deadly weapon, to wit: a Bowie knife. Citing Ind.Code § 35–42–2–1, Counts 11, 12, and 19 of the information charged battery as a Class C felony for having been committed upon P.M. and R.F., respectively, "while armed with a deadly weapon;" and Count 18 was a conviction of intimidation as a Class C felony for having drawn or used a deadly

weapon while committing the crime, as per Ind.Code § 35–45–2–1.

Because appellant, after moving for judgment on the evidence at the close of the State's case, went on to present evidence in his defense case-in-chief, the trial court's denial of his motion is beyond our review and we must proceed to the related issue of sufficiency of the evidence. *Hood v. State* (1990), Ind., 561 N.E.2d 494. On sufficiency review, this Court will uphold the convictions if, considering only the evidence and reasonable inferences therefrom supporting the verdict, and without reweighing the evidence or judging witness credibility, a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.; Butler v. State* (1989), Ind., 547 N.E.2d 270.

Appellant argues regarding Count 1 that because in this particular instance he made no overt threat to use the knife, its use as an aggravator was improper. However, for purposes of aggravation to a Class A felony, the criminal deviate conduct statute unambiguously lists three discrete factors in the disjunctive: "[I]f it is committed by using or threatening the use of deadly force, if it is committed while armed with a deadly weapon, or if it results in serious bodily injury to any person other than a defendant." Ind.Code § 35–42–4–2.

The evidence shows appellant had a Bowie knife strapped to his leg or otherwise under his control inside the vehicle while he forced P.K. to fellate him; given this proof of appellant being armed with a deadly weapon, no evidence of the alternative aggravator of threatening deadly force thus is required to elevate Count 1 to a Class A felony.

Appellant maintains Counts 11, 12, and 19 were not shown to rise to the level of Class C felony battery, for which Ind. Code § 35–42–2–1(3) requires proof of the battery having resulted in serious bodily injury or having been "committed by means of a deadly weapon." The proof at trial showed, as the information charged, that appellant was armed with the Bowie knife while committing these batteries; the

State accordingly argues the threat of harm implied by appellant's possession of the knife while grabbing P.M.'s breasts and groin area and while slapping R.F.'s face with his hand, respectively, is sufficient to constitute battery "by means of a deadly weapon."

The State is correct in its observation. The battery need not be accomplished by inflicting a wound with the weapon but may be accomplished because the perpetrator was able to subdue the victim by the threat, actual or implied, to use a deadly weapon. Thus, the battery was accomplished by mean of a deadly weapon. *See Litel v. State* (1988), Ind., 527 N.E.2d 1114.

The jury found appellant "guilty of Count 18, Intimidation, as charged in the information, a class C felony." The information charged in Count 18 that appellant "did communicate to [R.F.] an expression of intention to unlawfully subject [R.F.] to physical confinement, with the intent that said [R.F.] engage in conduct against her will, to-wit: have sexual intercourse with [appellant]...." Indiana Code § 35–45–2–1(b)(2) provides that intimidation is a Class C felony "if, while committing it, the person draws or uses a deadly weapon." The evidence shows that appellant "reached for" or "unsnapped" his knife. This is sufficient for the jury to find that appellant used a deadly weapon to accomplish his purpose. *See Litel, supra.*

Appellant contends the trial court erred in allowing the State to read into evidence the entire transcript of the testimony given in the first trial by R.F., who subsequently was killed in a traffic accident. Observing that he was acquitted in the first trial of twelve of sixteen counts involving R.F., appellant argues the admission of evidence of these twelve counts at his second trial was improper as it constituted the use of absent witness testimony thereby violating his Sixth Amendment right to confrontation. As he acknowledges, however, the admission of such former testimony lies within the sound discretion of the trial court as long as it was

given under oath, the party against whom it was offered had the opportunity to cross-examine the witness, and the witness is shown to be presently unavailable. *Moore v. State* (1984), Ind., 467 N.E.2d 720. As all three conditions were met here, it was not error to admit evidence of other crimes perpetrated upon R.F. by means of reading her former testimony.

Appellant also argues that even had it been live, the admission of R.F.'s testimony was reversible error because much of it amounted to the prejudicial use of evidence of other crimes for which he had been acquitted.

In *Little v. State* (1986), Ind., 501 N.E.2d 412, this Court, after discussing the principle of collateral estoppel against the State's use of prior crimes for which a defendant has been acquitted, stated:

> Application of collateral estoppel in this context requires that the trial court determine what facts were necessarily decided in the first law suit. The court must examine the record of the prior proceedings, taking into consideration the pleadings, evidence, charge and other relevant matters. *Ashe [v. Swenson],* 397 U.S. [436] at 444, 90 S.Ct. [1189] at 1194, 25 L.Ed.2d [469] at 475 [ (1970) ]. Then the court must decide whether the government in a subsequent trial attempted to relitigate facts necessarily established against it in the first trial. *See, United States v. Mock* 604 F.2d [341] at 343, 344 [ (5th Cir.1979) ]. If so, evidence of the former offense must be suppressed. 'The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not [to] be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality.' *Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194, 25 L.Ed.2d at 475.
> Only this two-part analysis can determine whether the trial court should have sustained Little's objection to the testimony of E.S. Although identity appears to be the only issue which could have been litigated in either of Little's rape trials, that question must be resolved by

the trial court and will not be answered by this Court on the basis of the present record." *Id.* at 415.

■ In the case at bar, the use of the facts presented in the prior case in which appellant was acquitted was error. We nevertheless find that the admission of this evidence is not reversible error.

The jury properly heard testimony about appellant's multiple acts of aggression against three different women. The evidence revealed an ongoing series of brutal, lurid, and public assaults. After listening to all that, it is unlikely that what the jury heard about raping R.F. in Jackson's house had much effect.

The admission in its entirety of the transcript of R.F.'s former testimony was not reversible error.

Appellant contends the trial court erred in admitting evidence of his sexual depredations committed upon M.Y., none of which was charged in the instant case. M.Y. testified that she met appellant at a party and accompanied him as part of a group to other parties the same evening. She related he became increasingly threatening as the night progressed, attempting to induce her to fellate him in his car and threatening to cut off her top and bra if she refused to expose her breasts to a 14-year-old boy at one of the parties. He finally forced her both to perform oral sex upon him and submit to it herself, threatening to harm her and if she told anyone he would arrange to have his friends harm members of her family.

Appellant argues M.Y.'s evidence of other criminal activity was inadmissible, citing *Malone v. State* (1982), Ind., 441 N.E.2d 1339; because identity was not at issue and thus neither the common plan or scheme nor depraved sexual instinct exceptions was applicable. He also points out that the episode involving M.Y. occurred several months *after* those involving P.K., P.M. and R.F. and maintains this remoteness weighs in favor of excluding M.Y.'s evidence. He argues his alleged conduct toward M.Y. and the other three victims shared no characteristics similar enough to earmark a common plan or scheme, argu-

ing the use of force is not in itself sufficiently unique.

■ Indiana case law, however, favors the admissibility of M.Y.'s testimony. Evidence of acts committed subsequent to the crime charged may be used to show a depraved sexual instinct, absent any issue of remoteness. *Lutz v. State* (1989), Ind. App., 536 N.E.2d 526. A "few months later" is not sufficiently remote to detract from the relevance of such evidence. *See Crabtree v. State* (1989), Ind.App., 547 N.E.2d 286. Such evidence is properly admitted where identity indeed is not at issue, but the State seeks to demonstrate the defendant's depraved sexual instinct where the victim's accusations, standing alone, seem improbable. *Stwalley v. State* (1989), Ind., 534 N.E.2d 229; *Grey v. State* (1980), 273 Ind. 439, 404 N.E.2d 1348. Such acts committed upon various victims need not be identical for evidence thereof to be admitted; it is sufficient if the same depraved sexual instinct is involved. *Hodges v. State* (1988), Ind., 524 N.E.2d 774. Here, appellant's actions regarding all four women reveal a propensity to utilize intimidation, sexually-related battery and criminal deviate conduct to brutally exploit and attempt to dominate his female victims. The admission of M.Y.'s testimony was not error.

The trial court is affirmed.

SHEPARD, C.J., and KRAHULIK, J., concur.

DeBRULER, J., concurs and dissents with separate opinion in which DICKSON, J., concurs.

DeBRULER, Justice, concurring and dissenting.

The jury returned verdicts of guilty of the battery Counts 11, 12, and 19, "as charged in the information, a class C felony." As stated to the jury in the preliminary instructions, Counts 11 and 12 charged that appellant Kuchel did "knowingly touch [P.M.] in a rude insolent and angry manner ... while armed with a deadly weapon ... contrary to ... Ind.Code 35–42–2–1 ...." Count 19, likewise provid-

ed to the jury, charged the touching of R.F. in precisely the same language. The state of being armed with a deadly weapon while engaged in an unlawful touching is not the element which raises a battery to the Class C level. That element is instead the accomplishment of an unlawful touching "by means of a deadly weapon." *Matthews v. State* (1985), Ind., 476 N.E.2d 847. These three counts did not charge Class C batteries. I would therefore order the convictions on these three counts reduced to Class B misdemeanors with appropriate sentences. I note that the battery statute, including the phrase, "by means of a deadly weapon," was read to the jury as part of the final jury instructions. The jury therefore had instructions before it which were at odds with one another with respect to an indispensable statutory element. The existence of such final instructions does not correct the error and does not alter my judgment.

If I were to accept the jury instructions as accurate, I would nevertheless arrive at the same result, as the evidence that the batteries were accomplished "by means of a deadly weapon" is woefully lacking. The evidence shows no more than that appellant was armed at the time, that the victims were aware that he was armed at the time, and that the victims were afraid he might use it against them. Such evidence is insufficient. The weapon must be actively employed in the illegal touching. *Litel v. State* (1988), Ind., 527 N.E.2d 1114.

With respect to the remainder of the case, I concur.

DICKSON, J., concurs.